and Calmo Matias v. Garland 23-4119 is submitted, and Kistner v. Loma Prieta Joint Union Elementary School District 24-1261 is submitted. With that, we have two cases for argument today. The first is United States v. Rowe 23-1240. Each side will have 15 minutes. Good morning. Verna Weifold on behalf of Zachary Rowe. I would like to discuss the buyer-seller jury instruction argument, and if I have time I will discuss the mask issue. The court in this seller instruction, and I would submit that that is per se reversible error in this case. That is because there was clearly not just some evidence, but plenty of evidence to support that instruction. The defense was certainly plausible, even if debatable, and there was no other jury instruction that adequately covered this defense. The court did provide the Ninth Circuit instructions on conspiracy to distribute, did it not? That is correct, it did. It's, you know, the standard instruction, but the instruction does not even hint at the fact that a defendant charged with conspiracy, a defendant like Mr. Rowe who was selling drugs on Facebook, could defend himself against the conspiracy instruction. And I think it's important, you know, in that Moe case, there the court held that the instruction, you know, there was certainly plenty of evidence to support the instruction, but the reason that they found it was not necessary in that case was because there was only one other, one crime basically charged in indictment. And so the jury would not have been confused. But in our case, Mr. Rowe was charged with one count of conspiracy, but there were so many alleged, you know, co-conspirators, unknown conspirators, unindicted co-conspirators, and 49, excuse me, overt acts. And because he was selling all these drugs to people on Facebook, that the main conspirator, Caporelli, had absolutely nothing to do with, there's no evidence that she knew anything about that, the jury is going to be very confused. So his defense, the jury instruction that was given did not. Counsel, as I understand it, the buyer-seller instruction normally addresses a situation where we have an addict who is buying and selling drugs in order to support a habit. Here, the evidence was overwhelming that your client was involved in a large-scale drug distribution operation involving multiple customers. I'm having a difficult time understanding why the model instruction from the Ninth Circuit didn't adequately cover his defense that, no, I was just, I was just buying this and selling for personal use so that I could support my drug habit. Well, the court brings up a good point, but that's not the law. If you go back and you look at, there is the Mendoza case, which, and that's what the judge, the district court focused on, was he was buying drugs to support a habit. But we have the Loveland case, we have the Ramirez case, and in both of those cases, the defendants were selling multiple quantities of drugs. In one case, I think it was Ramirez, they're both discussed in my brief, he was selling to an undercover agent. But the reason that the court overturned those convictions based on the buyer-seller rule was because, although the defendant was selling drugs to multiple people, and not just for personal use, was because there was no evidence or very weak evidence that the defendant was actually conspiring with the co-defendant. And if you look we've got all these text messages, we've got the recorded jail conversation where he says, I don't know how I'm going to convince a jury that I wasn't doing what I was doing. And then, you know, basically the text messages talking about, we got to get our act together here. We're not doing a very good job of running this drug distribution business. I'm just having a hard time seeing why the model instruction wasn't adequate to support the defense here. And that's basically what our cases have said. He was selling drugs to all these people on Facebook, and he conceded that. But he wasn't charged with selling drugs to people on Facebook. He was charged with being in a conspiracy with Debra Caporelli. And let's look at the evidence. Okay. Caporelli, when she met with Contreras, the undercover agent, she said, I work solo. She never mentioned Mr. Rowe's name. And they have no evidence or, you know, conversations that show that he was, that Rowe was conspiring with Caporelli to get drugs from the police. That's an accurate recitation of the evidence. You're ignoring the Facebook message that she sent to him in which she basically is chiding him for running a sloppy drug distribution business, and that we've got to get our act together here because we're losing thousands of dollars, because apparently his bookkeeping wasn't very good. You can say there was no evidence to support that the two of them were conspiring to distribute controlled substances. All right. Well, maybe I'm not saying that it was no evidence, but that it was clearly those Facebook messages between Caporelli and Rowe also show that he was buying drugs from her. And then he turned around and sold them on Facebook. So the issue here is not whether there was no evidence to support a conspiracy between the two, but whether or not there was adequate evidence in the record to support the instruction. And it is up to a jury to decide whether or not his defense would succeed. It's not whether or not you or I or, you know, those us veterans would have bought that defense, but whether the jury would. The issue is whether it was plausible, even if debatable. And because we do have the evidence and, you know, the Moe case says it is a highly fact intensive issue. And so therefore, if there was plenty of evidence to support the defense, whether or not, as again, I said, it was plausible, even if debatable, and it should have been given. Can I ask you whether the theory was that he was the seller and the issue was the jury was going to get confused about his customers, or was the theory that he was the buyer from Caporelli? What was the idea of how this instruction was supposed to be the theory? I think the theory was, is that he was both the buyer from her and then the seller to other people that Caporelli had absolutely nothing to do with, or any knowledge of. And so, you know, remember, I'm not arguing here a sufficiency of evidence claim. I am arguing only whether Mr. Roe was denied his Sixth Amendment right to present a complete defense. And so because there was evidence in the record to support his defense, it was up to the jury to make that decision. And because he was deprived of that defense, he, the... Do you have a case where this instruction should have been given where the theory was that the person was both the buyer and the seller in the instruction? I mean, I think usually they're just the buyer, right? Well, I do not, because in the cases that I cited, you know, Loveland, Ramirez, and Mendoza, those are not cases where the instruction was in fact given in those cases. And so this court reversed on, you know, sufficiency. So the issue is, it's very rare that a court will, you know, under evidence like this, will completely deny the instruction. And that's the issue in this case. It's unique. And so, like I said, only in the Moe case, where, as I said, the distinction in the Moe case, where this court said that you didn't need to give the instruction, there's a very, very narrow, tailored indictment, and this indictment is all over the map. And so that's why it should have been given. Can I ask you about the mask issue? Absolutely. I love to talk about that. So is there anything in the record that shows us what this mask, the masks, these clear masks looked like, or any objection that describes in what way they allegedly impaired the view of the witness? Well, the judge did make a finding on the record that you could see the person's nose, and you could see the, you know, the lips and that, or whatever it is, and that sort of thing like that. But I don't think, I mean, we can go at, you know, use our common sense that this mask, it is entirely designed for lip reading. Counsel, I'm looking at the district court's statement here, where he says, witnesses will be wearing clear masks, which allowed jurors and the defendant to observe the witness's facial expression. The confrontation clause does not require the jury to be able to see the entire face or body. However, in this case, they will be able to see the witnesses from head to toe. And was there ever any challenge to, first, to that factual determination by the district judge? No, the trial counsel did not specifically make any further objection to that. So why then, even if one assumed arguendo, that this issue even implicates the Sixth Amendment, but even if we were to give you that, why is that factual determination not dispositive here that there was no violation? Well, I think it is, I mean, these, you can, we can look on, you know, the internet. I mean, we can take judicial notice of the fact of what these masks look like, and the fact that they are designed for the hearing impaired. And for lip reading, we have to be like this close in order to read the person's lips. And so it's, and you still, I mean, think about it. I mean, it's a matter of common sense. You are still going to, you're, it's going to distort your face, your voice. And it is, it is not a substitute for the Sixth Amendment. These masks were designed for lip reading and not to protect a defendant's constitutional rights. So, yes, go ahead. Was there an objection by the defense to the masking of witnesses? To the masking? Yes. The masking, any masking, initially the defense counsel made a very good record that he objected to any masking as a violation of the Sixth Amendment right to confrontation. But given that the judge said you can see the witness, you're saying you can't see the witness, but I don't understand how we could agree with you instead of the fact finding of the judge when there wasn't even a further objection that said, you just said we can see the witness, but I can't see the witness. I mean, no one said during the trial, I can't see the witness. No, that's correct. I, you know, there wasn't a specific objection after the judge made that comment. My, my concern is that we, we can all know what these masks, you know, these clear masks look like, and they're not a substitute for the fact that the court made no finding case specific that these masks, any masks were necessary in this particular case. So whether it was a clear mask, because he did make a finding that it was necessary for, for health and safety of the people in the courtroom. But if we go back to the Texas, the Smith versus Texas case, which I cited there by the time of the trial, the mask mandates were the CDC, the state of California had been rescinded. You didn't need a mask to enter the courthouse. There was no finding that anybody in this case was immunocompromised. But the local rule, that determination up to each judge, does it not? I would say no, under the Maryland versus Craig, the judge has to make a case specific finding. Why isn't it enough that the district court said finally, and most importantly, the court concludes that it can safely conduct a jury trial in this case by imposing COVID-19 safety protocols. The court discussed those last week, including the use of multiple courtrooms, social distancing where possible, and the use of masks. I mean, I take that language as the court saying, there's a choice between conducting a trial with safety protocols, including masks, we're not conducting a trial right now. And if the judge had made the finding, all right, masks are a problem, so we won't have the trial, we'd be looking at a speedy trial act challenge, wouldn't we? Well, no, because this is January 2023. And again, I said, the pandemic no longer required, the CDC and the state of California no longer required these masks. And if the judge had said, okay, everybody's going to wear a mask, but when the witness takes a witness stand, they can just remove their mask, which what they did in a lot of cases that were tried at the height of the pandemic, we wouldn't be here, we wouldn't have a problem with that. I have no idea if this hypothetical is true, but imagine that this judge was either immunocompromised himself or knew that the prosecutor was immunocompromised or happened to know that the defense lawyer was immunocompromised. Do you think the judge had to say that on the record? Yes, absolutely. Why? Because if you look at Maryland versus Lake, judge has to make specific findings that are case specific to this particular case. You can't make assumptions like that. And the judge said it was necessary for keeping safety. You think they had to disclose a personal thing if that was the reason to, I mean, once they say this is needed, you don't think that's the finding? No, I think the court has to make specific findings. And if somebody felt bad, first of all, the judge said, if you are feeling symptoms or whatever it is, you need to let me know and you can't come into the courtroom and nobody did. Nobody told him that they were in any risk at all. So I don't think that the judge can just assume that there's a problem there. Because we have no evidence that anybody had any kind of symptoms or was at risk. And given this, the timing of, you know, all of this and that's why I think that the court should not have required even these clear masks in order to safeguard the Sixth Amendment right. I think I might be running out of my time. I'll give you two minutes for rebuttal, but let's hear from the government. Thank you. I'm sorry. Good morning, Your Honors, and may it please the court. William Larson for the United States. The jury convicted defendant of conspiring to distribute methamphetamine, heroin, and fentanyl after defendant admitted what was obvious to him, which was that the government's evidence was overwhelming. Government asked the court to affirm the conviction and sentence. And unless the court has specific questions, I'll just start where we left off with the mask issue. I agree with one thing defense counsel said, which is that this is a common sense claim. I think it's common sense that clear masks do not infringe on a defendant's confrontation right, at least on this record. There is, as the court noted in a number of questions, there's just no record evidence of any obstruction of any witness's face or demeanor. I think the district court's findings are detailed. It's about a six-page finding that goes through the procedural history of the case, and then the specific facts in this case of which aspects of confrontation would be preserved. I don't think the district court needs to make findings of an exceptional need for necessity. This is not what Marilyn B. Craig requires. It's just case-specific findings, not case-unique ones or exceptional case findings. And the district court made those in great detail in this case. Turning to the buyer-seller instruction, the district court did not abuse its discretion in holding there is no evidentiary foundation for a buyer-seller instruction in this case. And I think it's worth going through just very briefly the reasons that defense counsel offers for why they believe there was evidentiary foundation. I think three of them are just false, and the other one is maybe true but irrelevant. The first argument is that there was no evidence of an agreement that defendant would redistribute drugs for Caporelli. That's just false. Defendant admitted in Facebook posts, he had several pounds of methamphetamine that Caporelli had paid for, and defendant says to Caporelli in a Facebook message, we need to get that circulating for you because you already paid for it and it's just sitting there. That's about as an explicit acknowledgement. And this is 4ER, or excuse me, 3ER419. That's about an explicit statement of we're going to redistribute drugs for you as I think you're going to get. The second basis that defendant offered was that Caporelli said she worked solo and never said we. We pointed out a number of times where Caporelli and defendant together said we, not that any particular pronouns are required to establish a drug conspiracy. We need to be a lot more organized. Defendant explicitly said we have done a lot together in the context of drug trafficking. And this quote that defense counsel focused on today that Caporelli is saying she worked solo, it's only the first part of the quote. Caporelli says I normally work solo, but sometimes you have to have somebody else there for collection or for help. And that person was defendant. In fact, defendant was in a car where he and Caporelli then drove around together collecting the undercover officer's drug order that night. The third basis defendant offers is that he wasn't there when Caporelli is arrested. That's true, but that's not relevant under the Moe factors and I don't think we believe that conspirators need to spend every moment together to be conspirators. The fourth is that defendant did not personally possess the drugs when the Mazda was searched that first night. That ignores the over the two hours previous to that he and Caporelli had driven around collecting those drugs after the undercover officer ordered them. So I think when you look at the evidence in this case, it really just is very thin of anything that would support a buyer-seller instruction. And on the other hand, under this court's decisions in Moe and Ocampo-Estrada, one, we afford district courts wide latitude in formulating the instructions, but two, we're supposed to look at the entire relationship between the buyer and seller, not just focus on can we sort of pluck one fact out of the ether and make it sound like there might be a buyer-seller relationship. One, I don't think you can even do that here, but two, we are supposed to look at the whole relationship and that's what one of the things Moe instructs. And when you do look at that... Can I interrupt you and ask you to turn to a different topic? Can you address the drug quantity issue in sentencing? Because I'm really having trouble understanding how there was an adequate fact-finding here. So I think the district court's cross references, I appreciate the opportunity to explain that because I was looking through the order yesterday and I think the cross references obscure what actually is a pretty explicit finding by the court. So defendant objected both to the general drug quantity and to specific paragraphs of the PSR. And specifically paragraph 18 of the PSR is the paragraph containing the Miller, the sort of Miller quantity that's been at issue. So the district court first resolves the drug quantity and says, I find there's sufficient evidence to support a base events level of 36. I agree. If we just looked at that paragraph alone, I think it'd be a closer case whether that sufficiently resolved the factual finding. But what I'd point the court to is actually to ER 37, which is a couple of pages later. And that's when the district court is addressing the specific objections to particular paragraphs that defendant raised. And specifically to paragraph 18, which is the Miller seizure. And there the district court says, I think even if you put aside the information contained in those paragraphs, the paragraphs reflecting the Miller quantity, there is sufficient evidence for the trier of fact to support the base events level. So under rule 32, all the district court- What is that evidence? What is the court referring to there? I think you tried to piece it together in your brief with the Facebook posts, but I don't know how we, there's no finding that the Facebook posts weren't talking about the same drugs as the drugs that were calculated for other parts. Like you're using various things to get enough. There were drugs in the car. How do we know the Facebook posts weren't the same drugs as the drugs in the car? I don't understand how we could say the judge made a fact finding about this. So I would point the court to the government's sentencing reply, which is to ER 113. And we walked through some of this and we cite additional Facebook posts in the brief. But I think the reason that we know that the quantities in the Facebook posts are above and beyond what was presented at trial is the quantities being discussed are just so much greater. So for example, three ER 419, there's one message refers to 32 ounces of methamphetamine. Another refers to three pounds of methamphetamine. Either of those alone are just well above what was presented at trial. And I take the point, we don't know the purity of the drugs in the Facebook messages, but just assuming they're above the sort of 20% to even B methamphetamine, it sort of amply makes up the whatever gap between the trial evidence and the requisite 30,000 kilograms of converted drug weight necessary for the base events level of 36. I noted that the jury returned a special verdict in this case. A question is for and six that established by proof beyond reasonable doubt the drug quantities that are chargeable to the defendant is the district court entitled to rely on that jury finding when it fashions the sentence here? Absolutely, Your Honor. And I think where we get to that quantity was much lower, right? The quantity the jury had to find was much lower? Correct. But I think if you add them together with the trial evidence, so the chemist was about 1,383 grams of methamphetamine. If you combine that with, and we've set this out in a table in the brief, but with the finding of the fentanyl and the finding of the heroin made by the jury, that gets you to 28,760 kilograms of converted drug weight. That's based on the chemist's testimony. The chemist's testimony and then the drug quantity findings on fentanyl and heroin, which leaves a gap of about 1,200 kilograms of converted drug weight. Based on the conversion tables, that's about 60 grams of methamphetamine, so roughly two ounces, which is a very small amount. We have Facebook messages and we've highlighted a number of them talking two, three pounds. Others talking about a quarter pound, which is obviously four ounces, so more than we need. Math-wise, between the chemist's testimony and the heroin, we're at 28,760 and we needed to get another basically 1,240. Yes, exactly. To do that, the court could begin with the base that the jury established and then look at the other evidence in the case that's recounted in the sentence report and conclude that there were sufficient quantities, reasonably foreseeable to row, that could be considered in choosing a base offense level of 32. Correct. I think that's exactly what the court did, especially if you look at 1ER37, where it says, even setting aside this other seizure, based on the evidence, all of the evidence that I've considered, I find it was sufficient. I'd also point out the district court, in resolving another of the enhancements, found the Facebook messages reliable and attributable to defendant. Are you arguing that this is harmless error or not error at all? For the drug quantity findings? We're arguing it's not error at all. I think because of the challenges framed as whether the district court made sufficient findings. Under Rule 32, if the court determines the district court's findings weren't sufficient, then we agree that that would require a remand. We don't think they're insufficient here. We think the district court, in fact, specifically resolved the objected to the drug seizure attributable to Miller. Basically, you're saying that we can read from this thing on page 37 that this essentially was a finding that the Facebook posts were the drugs that were enough? We're supposed to understand it that way? It's not very specific or very clear how the judge is getting to the quantity here. I would combine that with the overall drug quantity findings on 1ER35, which discusses amounts reasonably foreseeable to conspiracy. Then the district court's other findings at sentencing, which discuss the reliability of the Facebook messages. Plus, I think it's an implicit adoption of the government's sentencing papers, which explicitly disclaimed reliance on the Miller seizure and relied on the Facebook. Counsel, you have the discussion of numbers on the bottom of 35 that bleeds into 36. Then you have the court saying the court, after talking about some other things about looking at the acts and omissions, the court finds that there's sufficient evidence in the record and that was presented to the jury to support the base offense level of 36. Then you have this additional testimony, this additional finding by the district court on 37. But the discussion on 36 comes right after the court talks about numbers, right? That's right. I agree with that, or I don't understand how the bottom of 35 answers this. I think what Judge Bennett was pointing out is this is coming immediately after the discussion of what the thresholds are. When we're talking about the amounts presented to the jury, because they are just shy of the amount required for base offense level 36, the district court says you know, information presented to the jury and sufficient evidence in the record and that was presented to the jury. So the district court, I think, is referring to the evidence that the government had submitted, which were, it was largely Facebook posts. It was several dozen pages. But Counsel, also, I mean, at the bottom of 35, he said, I mean, maybe I'm missing this, but he says you need 30 to 60, right? 30 to 90. Yes, you need 30 to 90. And then he says there's sufficient evidence presented to the jury to support 36, which he's just said on the page before us, 30 to 90. Correct. So it is an explicit finding that it was sufficient to exceed 30,000 kilograms of converted drug weight. I see I'm running low on time. I just, we do make a harmless error argument as to the buyer seller. I'm happy to address that if the court wants, but otherwise, we would ask that the court affirm the conviction in sentence. Thank you. I don't think we have further questions, so let's give two minutes for rebuttal. In terms of the sentence, I mean, the defense counsel's sentencing pleadings were very specific, starting from what the jury found. And the government's sentencing papers were extremely vague. And it was then they ultimately disavowed what the PSR relied on this Miller stuff. And the court, I would disagree that the court made any specific findings or resolved the difference between what the defense was saying and what the prosecution was saying, or made any specific finding that the quantity that was ultimately resulted in the guidelines in the 324 month sentence, that that was reasonably foreseeable to. So the government is arguing that the Facebook posts fill in the drug quantity that's missing. What's wrong with that argument? Because the well, in their arguments about why the buyer seller agreement instruction was not necessary, was because he wasn't charged with conspiring with the people on Facebook. I mean, and that's all just a bunch of, you know, if there's a conspiracy to sell drugs, those were the customers of the conspiracy, right? So what's wrong with using the drug quantities in the Facebook posts? Well, because the drug quant well, because we have to start with what the jury found. And that did not include the Facebook posts and the and the government, you know, we're talking about what caporelli and that's, you know, and the other defendants are were the drugs. What do you mean by the jury didn't find the Facebook posts? I'm not sure I understand what you mean by that. Well, I don't I mean, the thing is, is that the drugs that were put forth to support finding of the jury of the drug quantity included the drugs that were seized from caporelli. Not from, you know, conversations on Facebook, nobody on Facebook was arrested. No drugs were seized. They're just talking back and forth. Well, but but under I mean, you're essentially arguing against the Pinkerton rule, are you not? That basically, if the jury finds that a conspiracy exists, that he is chargeable with the responsibility for all drug distributions that were reasonably foreseeable and furtherance of the conspiracy. And so those textbook messages are clearly relevant under Pinkerton to drug sales that are reasonably foreseeable. And under our own bank decision in the United States versus Cardi, why isn't it adequate based on the recitation of the record that Judge Bennett summarized for us to conclude that the district court has shown enough of its work here to see that there was no error in the computation of the guidelines? Well, I think that given what the the very detailed defense sentencing memorandum and the reply and the government's arguments, which were very vague as to how you would actually calculate these drug quantities and the judge, his, the court's findings were basically that he was adopting the pre-sentence report and that the evidence was sufficient. That's very vague. So I think if you're going to go from an extreme. If we start with the what I'll call the starting point from the special verdict that the jury returned and we only need 1200 kilograms to get to the 30,000 level, then why can't the court look to the Facebook messages and the other evidence that's recounted in the pre-sentence report to conclude that there's enough here to charge the defendant with at least 30,000 kilograms? Well, I think that the court has to be much more specific in resolving the discrepancy between what the defense was putting forward and what the government was saying and what the PSR was saying, and the court did not do that. Sorry. Judge Freeland, I know we've. No, go ahead. Go ahead. Okay. So do you agree with the accuracy of this statement at page eight and paragraph 49 of the PSR, the guideline and commentary referring to 1B1.3a hold the defendant accountable for his behavior as well as the actions of others committed in furtherance of the jointly undertaken criminal activity with the exception of the conduct of others that was not reasonably foreseeable to the defendant, which is I think what Judge Talman was talking about vis-a-vis Pinkerton, but that's the statement in the PSR. Do you agree that's a correct statement of the law? I would agree that it is generally a correct statement of the law. The problem is that the PSR then found that, calculated this, all the drugs seized, this Ian Miller guy that even the government disavowed reliance on. So it's the connection, it's the leap between the evidence and the bare statement of what is the law. There was absolutely no evidence to show that Mr. Rowe would have known much less or known anything about Mr. Miller and that those drugs that were seized was reasonably foreseeable to him. Can I ask this maybe a different way? So I think the judge could have said these Facebook posts are enough. Like there definitely was enough evidence here to support the drug quantity. So it seems to me anyway, that the only question is whether the judge didn't make a specific enough finding. So we would need to remand for the judge to make that specific finding, which probably would be the Facebook posts are enough, and then probably would impose the same sentence. But you're arguing we should go through those steps. Why should we do that? Well, because again, the court's finding was very vague. So that if we have to go through it again, we have to go through it again. They have to give both sides an opportunity to defend their positions. And they have the court to actually resolve the discrepancies, which the court did not do. And this is done all the time. And it's the court's responsibility. And that is why we should remand. If we don't vacate the sentence, excuse me, the conviction, we should definitely remand the sentence. Is there any chance that if the court went back and recalculated that the quantity would actually be higher, and things would be worse for your client? No, I don't believe so. And I know I'm running, I've been on time. I just want to go back one last sentence about the buyer seller instruction, and everything that the government was saying. Remember, we're not here arguing a sufficiency of evidence claim. We are only arguing whether or not this defendant was deprived of his right to present a defense. That's the issue. Thank you. And I will submit. I will submit. We're out of time. So thank you both sides for the helpful arguments in this case. This case is submitted.
judges: TALLMAN, FRIEDLAND, BENNETT